IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JON L. HARTMAN, | ) | Case No. 4:05CV3090 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This is a disturbing, yet fascinating social security case. Jon L. Hartman (Hartman) is a pedophile who is involuntarily committed to a mental institution. Based largely on his pedophilia, Hartman seeks social security disability benefits.

An administrative law judge (ALJ) found that Hartman was not disabled. Hartman appeals. I will deny the appeal, and affirm the decision of the ALJ.

## *I. BACKGROUND*

I will first summarize the procedural history of this case. After that, I will briefly discuss the facts as they regard Hartman's pedophilia. (Hartman has other ailments, but they are not in dispute.) I will then summarize the ALJ's decision.

### *A. An Overview of the Procedural History.*

Hartman applied for disability benefits on January 21, 2000. (Tr. 63-65.) He was found not disabled, initially and on reconsideration. (Tr. 32-47.) After a hearing

on March 27, 2002, an ALJ also found that Hartman was not disabled. (Tr. 21-29.) The Appeals Council denied relief. (Tr. 5-6.)

Harman then appealed to this court. The government conceded error, and I remanded the case for further consideration. Specifically, I told the Social Security Administration: (1) to make a clear finding on the severity of plaintiff's alleged pedophilia and depression; (2) to properly determine Hartman's residual functional capacity with any such impairments in mind; and (3) to determine, with the limitations enumerated in the residual functional capacity determination and using the services of a vocational expert if necessary, whether Hartman could return to his past relevant work or other work. (Filing 25, 4:02CV3238).

I specifically directed the ALJ on remand to consider "a mental RFC assessment (Exhibit 8F) . . . ." (Filing 25 at 2, 4:02CV3238.) As we shall see, the ALJ did so. Indeed, the ALJ engaged an expert to testify on this and related subjects.

On November 28, 2004, after a supplemental hearing, a second ALJ[1] found that Hartman was not disabled. (Tr. 446-465.) The Appeals Council denied further review on March 30, 2005 (Tr. 433-435), and Hartman again appealed.

### B. An Overview of the Facts Regarding Hartman's Pedophilia.

Hartman has an extensive criminal history involving sexual abuse of female children, dating back to 1969. (Tr. 566, 600, 603, 608.) He has been imprisoned four times. (Tr. 566.) According to Hartman, each of his victims was a family member. (Tr. 265.) His last conviction and prison sentence involved a first degree sexual assault of a nine-year female relation. (Tr. 566.)

---

[1] The first decision was issued by Judge Burgess. (Tr. 29.) On remand, Judge Shattil authored the second decision. (Tr. 465.)

Hartman committed his last sexual assault in 1991 when he was 53 years old. (Tr. 566.) He was discharged from prison on November 20, 1996,[2] and five days later he was involuntarily committed. (Tr. 566.) On November 25, 1996, Hartman was evaluated by Dr. Sanat Roy and Dr. Thomas B. Murray, and, based upon their reports, the Dawson County Mental Health Board found that Hartman was a mentally ill and dangerous person.[3] (Tr. 303.) At the time of the second hearing before the ALJ, Hartman was held at the Norfolk Regional Center, Norfolk, Nebraska, pursuant to the Dawson County commitment order. (Tr. 585-586.)

The evidence regarding Hartman's mental status indicated the following: (1) his thinking was "'well-organized and goal-directed'"; (2) his speech was "normal in volume and tone, as well as coherent and relevant"; (3) he was alert and oriented; (4) his recent and remote memory were fine; (5) his intelligence was "'within normal limits'"; and (6) his insight and judgment were "'fair.'" (Tr. 448.)

---

[2] Hartman claimed his onset date was the day he was released from prison, November 20, 1996. (Tr. 599.)

[3] The standard for civil commitment under Nebraska law is that the person must be proven to be mentally ill and dangerous to himself or others by recent acts or threats. Neb. Rev. Stat. § 71-908 (2005). Child molesters like Hartman who have served prison time and are then discharged are subject to civil commitment under Nebraska law even though they have been in prison a lengthy period of time after the assault and before the commitment. See, e.g., In re Interest of Blythman, 302 N.W.2d 666, 671-72 (Neb. 1981)(holding that the defendant's sexual assault of young girl five years prior to a hearing on the question of whether the defendant was a mentally ill and dangerous person who required continued involuntary commitment was not too remote to be probative of the defendant's present state of dangerousness, particularly where the defendant had not had the opportunity to commit more recent acts in the intervening years because of his incarceration; thus, it was proper to consider the act as "recent" for commitment purposes under the Nebraska statutes).

Hartman's primary mental health diagnosis was "pedophilia (sexually attracted to females, exclusive type)'[.]"  (Tr. 448.)  He also had a "'depressive disorder, not otherwise specified'" and a "'personality disorder, not otherwise specified'[.]"  (Tr. 448.)  He had a history of amphetamine abuse which was in remission.  (Tr. 448.)

As the ALJ emphasized, Hartman's motivation for treatment was awful.  (Tr. 448.)  For example, a treating psychiatrist noted that "his attitude was 'cure me but don't treat me.'"  (Tr. 306.)[4]   That same note gave these details:

> [H]e never wanted to participate in treatment.  He expressed [a] desire to discontinue his Effexor and that was done, and he continued to have no problems with depression, sleep or appetite.  He was somewhat deviant and refused to participate in any treatment program; rather he felt that he enjoyed sexual activity with minor children, and the clinical team asked him to change that behavior and he is very unhappy about that.  The patient was not motivated nor was he doing anything in this intense program, so the clinical team felt that the patient may benefit from a less intensive treatment environment for sex offenders at the Norfolk Regional Center (NRC) . . . .  [T]he patient also expresses [a] desire to be transferred back to the NRC and this issue was discussed in great detail.

(Tr. 304.)

Later progress notes reveal a similar lack of motivation.  For example, in September of 2001, Hartman was seen in treatment for only five minutes and was "not interested in finishing the program."  (Tr. 580.)   In May of 2004, Hartman continued to follow this pattern:  "He continues, at times to be uncooperative with the rules and not follow his program."  (Tr.571.)  In fact, Hartman told the staff that

---

[4] "Psychiatric Discharge Note" dated December 29, 1999, prepared by Dr. Sanat K. Roy, M.D.  This note was prepared when Hartman was discharged from an intensive sexual offender treatment program at the Lincoln Regional Center and then transferred to the Norfolk Regional Center.

"some times he can become quite comfortable with others taking care of him." (Tr. 571.)

As I earlier observed, on remand I directed the ALJ to more thoroughly consider "a mental RFC assessment" which appears in the record as Exhibit 8F. (Tr. 248-255.) The ALJ carefully followed this direction.

Exhibit 8F is labeled "Mental Residual Functional Capacity Assessment" and it was prepared by Kathleen M. Acer, Ph.D. on October 13, 2000. (Tr. 248-251.) Dr. Acer reviewed the records, but did not examine the claimant. Out of the 20 categories on this checklist, she found that Hartman had no significantly limiting problems in 16 areas. (Tr. 248-249.) The doctor found that Hartman was "moderately limited" in two areas: the ability to work in coordination with others, and the ability to get along with peers. (Tr. 248-249.)

Dr. Acer also found that Hartman was "markedly limited" in two areas: the ability to get along appropriately with the general public, and the ability to maintain socially appropriate behavior. (Tr. 249.) It is these findings regarding "marked" limitations that form one of the fighting issues in this case. In this regard, it is especially noteworthy that Dr. Acer did not give any reasons for her conclusions, despite a space for explanation on the form. (Tr. 250-251.)

The ALJ retained Gary Gard, Ph.D. (Tr.499-505 (vitae); Tr. 506-507 (notice of hearing, medical expert.)) A former Assistant Professor of Medical Psychology in the Department of Psychiatry at the University of Nebraska Medical Center, Dr. Gard is a very experienced clinical psychologist.

Like Dr. Acer, Dr. Gard did not examine Hartman. On the contrary, he was asked to examine medical records from November 20, 1996, through October 12, 2004. (Tr. 506.)

-5-

At the hearing, Dr. Gard testified and was cross-examined regarding Exhibit 8F and other things. In summary, he told the ALJ and plaintiff's counsel that:

(1) Hartman remained confined because of "the failure of the claimant to respond more appropriately to the treatment" (Tr. 598), as opposed to "episodes of decompensation." (Tr. 594.)

(2) He agreed with the conclusions of Exhibit 8F *except* that (a) Hartman was only moderately limited in interacting with the general public (Tr. 603-604) and (b) Hartman was only moderately limited regarding the ability to maintain socially appropriate behavior with the general public. (Tr. 604.)

(3) Regarding females under the age of 18, Hartman was markedly limited in interacting with them and maintaining socially appropriate behavior with them. (Tr. 603-604.)

(4) The only work-related limitation that Hartman had was avoiding being around (female) children. (Tr. 595.)

### C.  *An Overview of the ALJ's Decision.*

The ALJ's decision was very detailed. (Tr. 446-465).[5] The ALJ found that Hartman had medically determinable impairments which imposed more than slight limitations upon his ability to function. These impairments were pedophilia, degenerative changes of the thoracic spine, scoliosis, and a bilateral hearing loss that was partially restored by hearing aids. (Tr. 464.)

The ALJ adopted Dr. Gard's testimony regarding Hartman being "markedly" limited only when it came to females under the age of 18. (Tr. 451-452). Relying upon the testimony of a vocational expert (Tr. 606-612), the ALJ concluded that

---

[5]For example, the ALJ devoted eleven pages to a careful parsing and discussion of the one Eighth Circuit case relied upon by Hartman. (Tr. 452-463.)

Hartman had the residual functional capacity to perform his past relevant work as a truck driver. (Tr. 465.) The ALJ specifically rejected Exhibit 8F to the extent it was inconsistent with these findings, and instead "closely followed the testimony of Gary Gard Ph.D . . .." (Tr. 452.)

The ALJ discounted Hartman's credibility insofar as Hartman claimed to be totally disabled as a result of his attraction to female children. (Tr. 465.)[6] The judge emphasized that "Mr. Hartman did not demonstrate impulsiveness of behavior, lack of customary standards of good judgment, failure to appreciate the consequences of his act or a combination of any such conditions . . .." (Tr. 462.)

As noted, the ALJ explicitly adopted Dr. Gard's view of the severity of Hartman's limitations insofar as pedophilia is concerned. The ALJ used those limitations as the basis for a hypothetical question put to the vocational expert. (Tr. 606-608). As part of the hypothetical question, the ALJ asked the vocational expert whether Hartman could work as a truck driver when he "needs to avoid being around children under 18 . . .." (Tr 606.)

The vocational expert testified that he could work as a truck driver with those limitations. (Tr. 608.) Indeed, in response to a question put to the vocational expert by Hartman's able lawyer, the vocational expert testified that the "work of a truck driver does not involve interaction with females under the age of 18" and Hartman is not "precluded from that work" by his pedophilia. (Tr. 609.)

In fact, the vocational expert believed that Hartman was able to engage in other types of work. The vocational expert told the ALJ that if even if a person like Hartman could not work as a truck driver, with the limitations posited by the ALJ

---

[6]At the second hearing, while Hartman did testify, he did not elaborate on his pedophilia or his treatment for that illness. (E.g., Tr. 589.)

(and Dr. Gard), such a person could find plenty of jobs as a factory assembler. (Tr. 611.)

## II. ANALYSIS

Ultimately, I decide that the ALJ did not legally err and that the decision was supported by substantial evidence considering the record as a whole. But, to address Harman's specific objections, I will also discuss each of his arguments and explain why they have no merit.

Condensed, Hartman asserts two errors. (Filing 13 at 7 (Plaintiff's Brief).) First, he argues that the ALJ erred when the judge failed to accept the opinion of a state agency doctor. (Id.) Second, he argues that the "ALJ failed to take into consideration the . . . indefinite, involuntary, inpatient hospitalization" and, in that regard, failed to follow binding Eighth Circuit precedent. (Id.)

For this latter argument, Hartman relies upon a case which is forty years old. That case is Marion v. Gardner, 359 F.2d 175 (8th Cir. 1966) (the Court of Appeals, speaking through then Judge Blackmun, held that a 33-year-old man confined in a maximum security hospital for an indefinite period as sex deviate under Minnesota Psychopathic Personality Act, who had a history of molesting young boys and who could pursue his calling as a salesman only under close and continuous supervision, was "disabled" within the meaning of the Social Security Act and thus entitled to disability insurance benefits).

### A. The ALJ Did Not Improperly Reject the Views of an Agency Doctor.

The first argument asserted by Hartman is essentially that the ALJ erred by accepting the opinions of Dr. Gard, a non-treating and non-examining agency doctor,

-8-

over the opinions of Dr. Acer (expressed in Exhibit 8F), another non-treating and non-examining agency doctor. This was not error.

Unlike Dr. Acer, Dr. Gard testified. Unlike Dr. Acer, Dr. Gard was questioned by the ALJ and Hartman's lawyer. Dr. Gard explained his views and was forced to defend them.[7] Dr. Acer, who used a checklist, failed to explain and was not required to defend her opinions.

In short, because one expert testified and gave reasoned explanations for his views and the other expert did not, it was perfectly proper for the ALJ to credit the former rather than the latter. See, e.g., Goose v. Apfel, 238 F.3d 981, 984 (8th Cir. 2001) (one non-testifying, non-examining expert's opinion cannot be considered substantial evidence to defeat the decision of the ALJ which is supported by substantial evidence); Brachtel v. Apfel, 132 F.3d 417, 420 (8th Cir. 1997) (where, as in Hartman's case, the district court remanded to develop a better record and on remand consultative psychiatrists and psychologists disagreed, the Court of Appeals affirmed the denial of benefits after the remand; the Court of Appeals held that "it is properly left to the fact-finder to weigh the evidence provided" by the experts).

### B. The ALJ Did Not Improperly Consider the Claimant's Involuntary Hospitalization and the ALJ Properly Distinguished Marion.

The main argument asserted by Hartman is that the ALJ failed to properly consider Hartman's involuntary commitment and, in that regard, failed to take into account the Marion case. There are three reasons why Hartman's argument has no merit.

---

[7]Dr. Gard's testimony also satisfied the "common sense" test. As Dr. Gard indicated (Tr. 603-604), and the ALJ emphasized in her opinion (Tr. 452), simply because one has an unnatural attraction to females under the age of 18 cannot logically be extrapolated to mean that one is unable get along in the adult work force.

First, Hartman implies that involuntary commitment is conclusive evidence of disability, but that implication is not the law.[8] On the contrary, the general rule is this: A showing that a claimant has been placed "in an institution established to provide treatment for mental disorders is not sufficient by itself to establish that the claimant's mental disorder precludes the claimant from working." 3 Social Security Law and Practice § 43:91 (West 2005) (footnote omitted). Rather, the "narrow question that must be answered is whether a claimant would be able to work if released." Id. (footnote omitted).

In answer to the "narrow question," substantial evidence established that Hartman had no job-related limitations regarding his past relevant work as truck driver save avoidance of labor with underage females. Since underage females do not drive trucks or work on loading docks or typically work with truck drivers in other roles, Hartman could return to his former job if he were released.

Second, the facts of the Marion case are distinguishable.[9] For example, unlike the Marion decision where the claimant had been found to be legally "insane" because of an "utter lack of power to control [his] sexual impulses," Marion, 359 F.2d at 181, Hartman, who is otherwise fully competent, has elected not to be treated. The evidence does not establish that he lacks the power to control his sexual impulses. On the contrary, the evidence reveals that Hartman lacks the will to do so. See, e.g., Pierce v. Gardner, 388 F.2d 846, 848 (7th Cir. 1967) (distinguishing Marion because

---

[8]Indeed, the Marion decision, upon which Hartman relies, make this clear. Marion, 359 F.2d 182 (stating that "we are not holding that confinement imposed by court order automatically equates with the statutory disability.").

[9]The Marion court stressed that these types of cases are highly fact-specific and that each of these kinds of cases must be judged on its own peculiar facts. The court warned that the "next [sexual deviant's] case may have a contrary result." Id. at 182. As a result, it is unwise to tease from Marion a rule applicable to other cases.

-10-

the claimant in Pierce had "only a mental or personality disorder coupled with a propensity (not uncontrollable impulse) to the commission of sex offenses").

Third, the underlying statutory framework for Social Security disability has changed dramatically since the Marion decision. The ALJ recognized that change and distinguished Marion as a result. (Tr. 463.) The judge was correct in doing so.

The court in Marion thought it especially important that no one would hire the claimant knowing of his background. It said: "Rare, indeed perhaps even non-existent, would be the reputable employer who, knowing of the applicant's assaultive tendencies, would hire him." Marion, 359 F.2d at 181. Since then such a consideration has been declared irrelevant by Congress. See 42 U.S.C. § 423(d)(2)(A).[10] As a result, Marion provides no precedent for construing the present statutory scheme. See, e.g., Herbert. v. Secretary of Health and Human Services, 758 F.2d 804, 805-06 (1st Cir. 1985) (declining to follow Marion because "[f]ederal law has changed" and citing 42 U.S.C. § 423(d)(2)(A)).[11]

In summary, the ALJ focused on the right question, and that was whether Hartman could work if he were released from involuntary commitment. Since he could work if he were released, Hartman was not disabled even though he is indefinitely confined and even though he suffers from the mental illness known as pedophilia.

---

[10] In pertinent part, that statutes precludes consideration of "whether [the applicant] would be hired if he applied for work."

[11] The statute has also changed in another respect since the Marion decision was handed down. It now provides in pertinent part that a "mental impairment" that "arises" from or is "aggravated" by a felony conviction "shall not be considered in determining whether an individual is under a disability." 42 U.S.C. § 423(d)(6)(A). As a result, Hartman cannot claim that his illness was made worse by his several stays in prison.

### *III. CONCLUSION*

Involuntarily committed pedophiles, who are otherwise capable of work, but who are "quite comfortable with others taking care of [them]" and who reject treatment because they do not desire to change, are not "disabled" for Social Security purposes. Simply put, there is a difference between character defects and disabling mental illness. Therefore,

IT IS ORDERED that the appeal is denied. Judgment will be entered by separate document.

October 12, 2005.                          BY THE COURT:

                                           *s/Richard G. Kopf*
                                           United States District Judge